IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| BRE HOTELS & RESORTS LLC, *et al.*,<br><br>Petitioners,<br><br>vs.<br><br>ACE AMERICAN INSURANCE COMPANY, *et al.*,<br><br>Respondents. | Civil No. 24-00159 MWJS-KJM<br><br>ORDER DENYING RESPONDENTS' MOTION TO DISMISS AND GRANTING PETITIONERS' PETITION TO COMPEL ARBITRATION |

## **INTRODUCTION**

After a rainstorm damaged two of its resort properties, BRE—short for BRE Hotels & Resorts LLC, BRE Iconic GWR Owners LLC, and BRE Turtle Bay Resort LLC—filed an insurance claim with its insurers.  The insurers paid some of the claim, but tens of millions of dollars remained in dispute.  To resolve the disagreements, BRE demanded that the insurers submit to a form of arbitration called appraisal.  They refused.  BRE then filed this petition to compel appraisal, and the insurers moved to dismiss on *forum non conveniens* grounds.

For the reasons discussed below, the Court DENIES the motion to dismiss and GRANTS the petition.

## BACKGROUND

This insurance dispute arises from a rainstorm in Hawaiʻi.  On March 9, 2021, a storm allegedly damaged two Hawaiʻi resorts, the Grand Wailea Resort on Maui and the Turtle Bay Resort on Oʻahu.  ECF No. 1, at PageID.10 (Pet. ¶ 24).  BRE owns both properties, and it estimates losses exceeding $55 million.  *Id.* at PageID.11 (¶ 30).

A few months after the storm, BRE filed an insurance claim with its insurers.  Relevant to this action, BRE sought $46 million in four categories: business interruption losses at the Grand Wailea ($29.6 million); damaged tiles at the Grand Wailea ($8.3 million); furniture, fixtures, and equipment at Turtle Bay ($6.2 million); and an assortment of ancillary issues at both properties ($1.9 million).  *Id.* at PageID.11-12 (¶ 31).

Those insurers—the sixteen Respondents in this case[1]—all sold insurance policies to BRE.  Their policies were largely identical, and they insured BRE

---

[1]    They are ACE American Insurance Company; Certain Underwriters at Lloyd's, London; Chubb European Group SE; Colony Insurance Company; Continental Casualty Company; Endurance American Specialty Insurance Company; Endurance Worldwide Insurance Ltd.; Evanston Insurance Company; Everest Indemnity Insurance Company; Landmark American Insurance Company; Lex London; Lexington Insurance Company; National Fire and Marine Insurance Company; Starr Surplus Lines Insurance Company; Westchester Surplus Lines Insurance Company; and Westport Insurance Corporation.

properties in over a dozen different states, including Hawaiʻi.  ECF No. 43, at

PageID.892.

When Respondents received and investigated BRE's insurance claim, they

took issue with BRE's estimates.  Respondents principally contended that most of

the tiles suffered from an independent defect and were not damaged by the storm,

that the insurance policies did not cover the replacement of undamaged furniture,

and that the claimed business interruption losses were too high.  Of the requested

$46 million, Respondents paid out around $4 million.[2]  *Id.* at PageID.11-12 (¶ 31).

BRE was not satisfied, as it believed the insurance policies entitled it to over

$40 million more.  And so in December 2023, BRE demanded appraisal, which is a

form of arbitration limited to disagreements between parties over the amount of

loss.  *Id.* at PageID.14 (¶ 36).  Respondents rejected the demand.

This petition to compel arbitration followed, brought pursuant to Chapter 1

(for the domestic insurers) and Chapter 2 (for the international insurers) of the

Federal Arbitration Act, or "FAA."  9 U.S.C. §§ 1-16, 201-208; ECF No. 1, at

PageID.14-17 (Pet. ¶¶ 39-52).  Respondents moved to dismiss, arguing that the

policies contain forum selection clauses that commit the parties to the exclusive

---

[2]     The parties agree that Respondents have paid nearly $14 million of BRE's total claimed losses of over $55 million.  *See* ECF No. 1, at PageID.11 (Pet. ¶ 30). But of the four categories of recovery that are in dispute in this action—which total $46 million—Respondents have paid around $4 million.  *Id.* at PageID.11-12 (¶ 31).

jurisdiction of New York's state courts.  ECF No. 24.  A hearing was held on

August 28, 2024.  ECF No. 45.

## DISCUSSION

As a threshold matter, the Court considers whether it has subject matter

jurisdiction over the petition.  Finding that it does, the Court turns to Respondents'

*forum non conveniens* argument.  And because it concludes that the District of

Hawaiʻi is a proper forum, the Court evaluates whether the policies require

appraisal, and finds that they do.

### A.    Subject Matter Jurisdiction

BRE properly relies on the FAA because appraisal "constitutes arbitration"

for purposes of that statute.  *Milligan v. CCC Info. Servs. Inc.*, 920 F.3d 146, 152

(2d Cir. 2019).  But that does not answer the question of whether this Court has

subject matter jurisdiction over the dispute.  Chapter 1 of the FAA—the part of the

Act that covers domestic arbitration agreements—is "something of an anomaly in

the field of federal-court jurisdiction in bestowing no federal jurisdiction but rather

requiring an independent jurisdictional basis."  *Hall St. Assocs., LLC v. Mattel,*

*Inc.*, 552 U.S. 576, 581-82 (2008) (internal quotation marks omitted); *see also* 9

U.S.C. § 4 (providing for action in a federal district court "which, save for such [arbitration] agreement, would have jurisdiction under title 28").

BRE does not invoke this Court's diversity jurisdiction, so the question is whether there is some basis for exercising federal question jurisdiction. And there is. Although Chapter 1 of the FAA does not grant any jurisdiction, Chapter 2 of the FAA—covering international arbitration agreements—does. That latter chapter incorporates the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and it expressly provides for federal question jurisdiction for disputes arising under that Convention. *See* 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.").

BRE therefore properly invokes this Court's federal question jurisdiction for the arbitration agreements with international insurers under Chapter 2. ECF No. 1, at PageID.9 (Pet. ¶ 22). And the Court may properly exercise supplemental jurisdiction over the Chapter 1 agreements with domestic insurers. *See id.*

## B. Forum Non Conveniens

Although the Court has subject matter jurisdiction over the petition, Respondents ask the Court to decline to resolve its merits nonetheless. They argue that the insurance policies contain a forum selection clause that commits all actions stemming from the policies to the exclusive jurisdiction of New York state courts.

For that reason, they contend that the District of Hawaiʻi is an improper forum and move to dismiss the petition under the doctrine of *forum non conveniens*.  *See generally Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013) (explaining that "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*").

Respondents rely on a section of the insurance policies entitled "Governing Law and Jurisdiction."  *See* ECF No. 24-1 (Mem. in Supp. of Mot. to Dismiss), at PageID.263-64.  In most of the policies at issue, this section contains the following language:  "The parties hereto do irrevocably submit to the exclusive jurisdiction of the Courts of the State of New York . . . ."  *E.g.*, ECF No. 24-3 (insurance policy issued by Westport), at PageID.298.  But this section also states that "[t]he parties hereto do irrevocably submit to the exclusive jurisdiction of the Courts of the state or country in which the First Named Insured has its principal place of business."[3] *E.g.*, *id.*  The policies thus contain an internal contradiction:  the parties are committed both to the exclusive jurisdiction of New York state courts *and* to the

---

[3]     In addition to these two provisions, some of the policies also state that, "[i]f the Insured's principal place of business is in Canada, . . . [a]ny disputes arising hereunder will be exclusively subject to Canadian jurisdiction."  *E.g.*, ECF No. 24-4, at PageID.365.  That provision would be inapplicable here, as BRE's principal place of business is Illinois.

exclusive jurisdiction of the "state or country in which [BRE] has its principal place of business," which is Illinois.  ECF No. 41, at PageID.792.

From the outset, this presents a challenge for Respondents.  A forum selection clause is only mandatory if it "clearly designates a forum as the exclusive one."  *N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995).  Respondents here do not meaningfully argue that New York state courts are clearly designated as the exclusive forum.  But absent that clear designation, the forum selection clause is merely permissive.  *Id.*

Resisting such a result, Respondents attribute the apparent contradiction to a drafting error.  In support of their argument, they submit a declaration from Deborah Boice, an executive who handled negotiations on behalf of Westport Insurance Corporation,[4] one of the sixteen Respondents in this action.  *See* ECF No. 24-4.  According to Boice, the negotiations unfolded as follows:  At the beginning of 2020, Willis Towers Watson—BRE's insurance broker—tendered to the insurance market a request for insurance for BRE.  *Id.* at PageID.363 (¶ 8).  In support of its request, Willis Towers included a draft policy.  *Id.*  That draft contained a provision committing disputes to the "jurisdiction of the United States

---

[4]    Since issuing this policy to BRE, Westport has changed its name to Swiss Re Corporate Solutions Elite Insurance Corporation.  ECF No. 24-4, at PageID.362 (Boice Decl. ¶ 2).  Throughout this order, the Court refers to this entity as Westport.

of America." *Id.* (¶ 9).  Westport evaluated the submission and responded with

proposed revisions.  *Id.* (¶ 10).  Among those revisions was the replacement of the

original forum selection provision with one that committed the parties to the

exclusive jurisdiction of New York.  *Id.* (¶ 10).  Boice discussed Westport's

proposed changes with a representative from Willis who, Boice says, "agreed with

the changes . . . including, among other things, New York choice of law and

exclusive jurisdiction."  *Id.* at PageID.364 (¶ 12).

But something went awry, for when Westport sent to Willis Tower a

binder—which is essentially a placeholder insurance policy—it included the

conflicting forum selection provisions.  *Id.* (¶ 14).  Boice says that she "did not

catch the drafting error," *id.* at PageID.365 (¶ 17), and the error "did not reflect the

agreement of [Westport] and Willis Tower[s] Watson," *id.* at PageID.364 (¶ 14).

Despite the "mutual mistake" that led to the contradictory forum selection

provisions, Respondents ask the Court to accept what they contend was the parties'

intent:  exclusive jurisdiction in New York state courts.  ECF No. 43, at

PageID.892.  They believe that the Boice declaration provides a sufficient

backdrop for reading all of the policies as creating exclusive jurisdiction there.

The Court cannot agree.  Respondents do not meaningfully dispute that the

forum selection clause is, as written, unclear.  And, as noted, a court ordinarily

does not enforce a forum selection clause when it is unclear.

8

To nevertheless have the petition dismissed on forum grounds, Respondents have two legal options.  First, they could argue that the doctrine of *forum non conveniens*—which can, under certain specific circumstances, permit a court to decline jurisdiction over a case in favor of bringing it in a more convenient venue—alone entitles them to dismiss the petition.  This is a tall order, however, for "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).  And without a forum selection clause, it is "rare" to dismiss a federal case because of a state court's convenience. *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007).  Respondents here do not attempt such an argument.

The other option for Respondents—and perhaps the more natural fit for their allegations—would be to argue that the conflicting forum selection provisions are the result of a mutual mistake and, as such, warrant reformation of the contract. Contract law permits reformation of a contract as a remedy for a mutual mistake. *See* Restatement (Second) of Contracts § 155 (June 2024 update).  And here, Respondents do call the conflicting provisions a "mutual mistake."  ECF No. 43, at PageID.892, 895, 896, 905.  Yet, at least for now, Respondents have expressly disavowed reformation in this Court. *See id.* at PageID.906 ("Respondents have

also not yet set forth a counterclaim for reformation.").[5]  The Court will not

advance an argument that Respondents have declined to make, particularly where

reformation is only appropriate "at the request of a party."  Restatement of

Contracts § 155.  Moreover, reformation—which requires a factual inquiry into the

intent of the parties—is difficult to resolve on a motion to dismiss, which is

perhaps why Respondents have not asked this Court to do so.

     Absent a request for reformation, however, the Court cannot read into a

contract a clear, mandatory forum selection clause where none exists.  That alone

is a basis for denying the motion to dismiss for *forum non conveniens*.

     Nevertheless, Respondents insist they still should prevail.  They suggest that

the uncontroverted Boice declaration provides critical context for reading the

policies.  And Respondents believe that the most natural reading of the policies,

once considered within the proper context, is that they contain a mandatory forum

selection clause.  Respondents, however, do not identify a doctrine of contract law

(other than reformation, which they expressly disavow) that supports their theory

of interpretation.  Even setting that aside, Respondents' argument suffers from two

factual shortcomings.

---

[5]     At the hearing, Respondents informed the Court that they have filed an
action in New York state court seeking reformation.  The point remains that no
request for reformation is before this Court.

First, Respondents have not shown that the Boice declaration is entitled, at this stage, to that degree of persuasive force.  As BRE points out, Boice represented a single insurer who sold a single policy to BRE.  There were at least fifteen other insurers who sold policies to BRE and are parties to this action.  Respondents contend that they offered a single declaration "[t]o prevent redundancy" and avoid "cumulative [d]eclarations."  ECF No. 24-1, at PageID.261 n.3.  They further suggest that Boice can speak for more than just Westport because Boice was informed that Westport "was acting as the lead carrier" with respect to this insurance program.  ECF No. 24-4, at PageID.365 (Boice Decl. ¶ 16).  But Boice's declaration only represents that she was *told* that she was acting as the lead carrier; it does not attest that she was, in fact, negotiating on behalf of the entire group of prospective insurers, or that all insurers shared her own subjective understanding of the negotiation history.  These omissions in Boice's declaration are especially significant because, elsewhere, Respondents stress their independence from one another.  *See* ECF No. 24-1, at PageID.261 ("*Each* of the Respondents, *severally* and not jointly, issued a *separate* insurance policy . . . ." (emphases added)).  Moreover, as discussed below, the policies' forum selection clauses differed from each other in material ways—which cuts against the suggestion that they all thought and did exactly as Boice did.  At this stage, with this record, the Court lacks a sufficient factual basis from which it can conclude

11

that every single Respondent entered its own "separate insurance policy" while making the same mutual mistake as Westport.

Second, the forum selection clauses for five of the sixteen insurers do *not* contain the conflicting provisions.[6]  Instead of committing jurisdiction to New York state courts, the policies for these five insurers provide for the application of Florida law and the "exclusive jurisdiction of the courts of the United States of America."  *E.g.*, ECF No. 41-2, at PageID.821 (policy issued by Certain Underwriters at Lloyd's, London; Chubb European Group; and Endurance Worldwide); ECF No. 41-5, at PageID.841 (policy issued by Lex London and Lexington); ECF No. 41-6, at PageID.851 (policy issued by Certain Underwriters at Lloyd's, London).  Respondents do not directly address this fact in either their opening or reply brief.

For these reasons, the Boice declaration does not provide a basis for finding a clearly designated, mandatory forum selection clause in any—let alone all—of the insurance policies.  And Respondents have not otherwise shown that the Court

---

[6]     These five insurers are the international companies:  Certain Underwriters at Lloyd's, London; Endurance Worldwide; Chubb European Group; AIG UK; and Lexington.

should overlook the clear contradiction that exists in most of the policies.  The

motion to dismiss is therefore DENIED.[7]

###  C.    Appraisal

After Respondents refused to fully satisfy BRE's insurance claim, BRE

demanded that they submit to appraisal.  Respondents rejected the demand, and

BRE now petitions this Court to compel appraisal.  *See* ECF No. 1 (Pet.), at

PageID.17.

At the center of the parties' disagreement is whether BRE's claim falls

within the ambit of the appraisal clause.  In relevant part, the appraisal clause

states:

> If the Insured and the Insurer fail to agree on the amount
> of a claim, each, upon the written demand of the other
> made within 60 days after receipt of proof of loss by the
> Insurer, shall select a[n] . . . appraiser.  The appraisers
> shall then select a competent and disinterested umpire. . . .
> An award in writing by any two shall determine the
> amount of loss.

ECF No. 1-4, at PageID.101 (policy issued by Endurance American).

---

[7]    BRE separately argues that even if the parties had entered into a clear,
mandatory forum selection clause, a Hawaiʻi state statute—Haw. Rev. Stat.
§ 431:10-221—renders the clause unenforceable under the circumstances
presented here.  *See* ECF No. 41, at PageID.797-805.  Respondents disagree.  *See*
ECF No. 24-1, at PageID.277-81.  Because the Court concludes that the motion
should be denied for the reasons discussed above, it declines to resolve the
arguments concerning this statute.

BRE contends that the four disputed categories of losses—the business interruption, the ancillary issues, the furniture, and the tiles—all fall within the bounds of the appraisal clause because they amount to disagreements about "the amount of a claim." *Id.* Respondents rejoin that the disagreements are about whether the policies can be interpreted to cover BRE's claim; in other words, they say that the disputes are legal questions of contract interpretation, unfit for appraisal. Additionally, Respondents argue that BRE has violated certain conditions precedent that preclude this petition.

1. The Court first considers Respondents' argument about conditions precedent. The insurance policies only permit lawsuits "for the recovery of any claim" if "the Insured has fully complied with all the requirements of this Policy." *E.g.*, ECF No. 1-4, at PageID.101. Respondents point out that the policies require BRE to "cooperate with the Insurer" by "submit[ting] to examination under oath" and "securing and giving evidence." *Id.* at PageID.103; *see also* ECF No. 38, at PageID.730. According to Respondents, BRE has failed to fully comply with these requirements.

These arguments are not sufficient to preclude appraisal. Take the examination under oath. After BRE served its appraisal demand on Respondents, and after Respondents rejected that demand, Respondents waited months before formally requesting an examination under oath of a BRE employee. *See* ECF No.

1-8, at PageID.172 (rejecting appraisal demand in letter dated February 2024);

ECF No. 38-3 (requesting examination under oath in letter dated April 2024).

They demanded the examination for the purpose of collecting factual information

about BRE's claimed business interruption losses.  ECF No. 38-3, at PageID.763

("The examination under oath will be comprised of questions regarding the Grand

Wailea Business Interruption Claim . . . .").  Respondents proposed a date in May

2024.  *Id.* at PageID.762.

It is true that a BRE representative has yet to sit for an examination.  But

BRE has offered to combine the examination with a deposition taken as part of the

appraisal process.  ECF No. 38-4, at PageID.766.  Respondents assert that such an

approach would be insufficient, but they fail to explain why a deposition—which is

questioning under oath—cannot qualify as an "examination under oath" within the

meaning of the policies, or at least why such a deposition would not materially

afford them all of the information they seek.  True, the deposition would not take

place on the specific date that BRE had originally requested.  But the insurance

policies do not require BRE to submit to examinations anytime, anywhere.

Respondents have offered no reason why BRE's proposal is unreasonable,

inconvenient, or inconsistent with the insurance policies.

For similar reasons, Respondents' assertion that BRE has failed to produce

evidence does not defeat the petition.  Respondents have made several requests for

information, the answers to which Respondents believe are necessary "to complete

their investigation of the claim."  ECF No. 1-6, at PageID.157.  Yet in neither the

exhibits they cite nor their briefing do Respondents identify specific deficiencies in

BRE's productions.  *Id.* (claiming that responses are "outstanding" but not

identifying any specific deficiencies); ECF No. 38 (Mem. in Opp'n to Pet.), at

PageID.747-49 (similar).  Moreover, Respondents even appear to admit that BRE's

responses were "substantially complete."  ECF No. 38, at PageID.749 (internal

quotation marks omitted).  Left with only Respondents' conclusory allegations

about BRE's noncompliance, this Court cannot conclude that BRE has failed to

comply with the cooperation clause in the insurance policies.

But assume for the moment that BRE had violated the cooperation clause,

either because Respondents had adequately explained why a deposition cannot

count as an examination under oath, or because Respondents had provided enough

detail to show that BRE's responses to Respondents' requests for information were

sufficiently untimely or incomplete.  Even then, Respondents could not preclude

BRE from enforcing its appraisal rights.  That is because Respondents have made

no effort to establish that any failure to cooperate has prejudiced them.  Hawaii's

highest court explained over 70 years ago—in a decision Respondents themselves

cite as authoritative precedent, *see* ECF No. 38, at PageID.747—that "[i]n

circumstances where a violation of the co-operation clause is urged, there must be

a lack of co-operation in some substantial and material respect." *Yuen Shee v. London Guar. & Accident Co.*, 40 Haw. 213, 226 (Haw. Terr. 1953) (cleaned up). A merely "formal" or "inconsequential" lack of cooperation would be "immaterial," that Court explained, for an insurer "is required to establish that the insured failed to co-operate with it in such way as to prejudice it." *Id.* (internal quotation marks omitted); *see also Lentini Bros. Moving & Storage Co., Inc. v. N.Y. Prop. Ins. Underwriting Ass'n*, 422 N.E.2d 819, 820 (N.Y. 1981) (distinguishing between cases where an insured has made an "unexcused and willful refusal to comply" and cases where an insured's "attempt to comply has fallen short through some technical and unimportant omissions or defects" (internal quotation marks omitted)).

Put differently, contractual provisions are not escape hatches. *See Standard Oil Co. of Cal. v. Hawaiian Ins. & Guar. Co.*, 65 Hawaiʻi 521, 526 n.4, 654 P.2d 1345, 1348 n.4 (1982) (policy conditions serve "to prevent the insurer from being prejudiced, not to provide a technical escape-hatch" (internal quotation marks omitted)).  Yes, parties must comply with their contractual obligations, but a minor technical infraction does not preclude a party from enforcing their own rights under a policy.  Here, Respondents have failed to show that BRE has not fully complied with the insurance policies, and they have failed to establish prejudice

17

from any alleged failure to comply.  BRE is therefore not barred from bringing this action.

 2.  The Court now takes up the heart of this action:  whether BRE's claim falls within the ambit of the appraisal provision.

 As an initial matter, although the parties disagree as to whether Hawaiʻi or New York law applies, the Court need not decide that question, as its conclusion would be the same under either.  Both New York and Hawaiʻi law distinguish between legal questions, which must be resolved by a court, and factual questions, which can be submitted to appraisal.  *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (the "scope of coverage provided by an insurance policy is a purely legal issue that cannot be determined by an appraisal"); *Wailua Assocs. v. Aetna Cas. & Sur. Co.*, 904 F. Supp. 1142, 1145, 1149 (D. Haw. 1995) (stating that, under provision submitting disputes over "the value of the property or the amount of loss" to an appraisal panel, "the appraisal panel should not consider issues pertaining to coverage and liability under the insurance policy" but should instead "determine the value" of the "damage sustained"); *Appraisal Requirements*, 2 Insurance Claims and Disputes § 9:33 (6th ed. March 2024 update) ("[T]he appraiser evaluates only the loss and does not consider questions of policy interpretation or scope of coverage.").  Even if disputes about coverage (a classic legal question) remain, both New York and

18

Hawai'i law allow claims about the amount of a loss to be sent to appraisal. *Amerex Grp. Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 205 (2d Cir. 2012) (holding that "the presence of a coverage dispute does not preclude an appraisal demand"); *Wailua Assocs.*, 904 F. Supp. at 1149 (compelling appraisal even where some coverage issues "have not yet been determined"). And regardless of which body of state law applies, "[b]ecause of the FAA's policy favoring arbitration, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (citing *Wasyl, Inc. v. First Boston Corp.*, 813 F.2d 1579, 1581-82 (9th Cir. 1987)).

With these principles in mind, the question here is whether Respondents' disputes over BRE's four categories of claims—business interruption, ancillary expenses, furniture, and tiles—are best classified as presenting legal or factual questions. The Court considers them in turn.

BRE asserts nearly $30 million in business interruption losses, $28.6 million of which remains in dispute. ECF No. 1, at PageID.12. Respondents insist that there are "separate coverage issues concerning the business interruption claim." ECF No 38, at PageID.738; *see also* ECF No. 1-9, at PageID.175 (email dated March 5, 2024, asserting "significant coverage and/or legal questions" with the business interruption claim). Yet neither in their brief nor in their cited exhibits do Respondents specifically identify what those purported coverage issues are. They

do not appear to contend that a particular type of loss falls outside the terms of the policies or that the policies require a certain method of calculating losses.[8]

It appears, moreover, that Respondents' core concerns are factual. Their planned examination under oath would have featured "questions regarding the Grand Wailea Business Interruption Claim," and Respondents requested documents that supported BRE's claimed business interruption loss. ECF No. 38-3, at PageID.763. These inquiries tee up a factual question about the amount of the loss—a question that falls squarely within the charge of the appraisal process. *See Amerex Grp.*, 678 F.3d at 206 (holding that appraisal panel appropriately "resolved factual questions regarding claims about the conflicting causes of the lost business income"). Appraisal is therefore appropriate as to the business interruption claim.

The ancillary costs also do not present a legal question. In a letter to BRE, Respondents conceded that certain property damage and ancillary costs at Turtle Bay Resort—which BRE claims is worth nearly $2 million, ECF No. 44, at

---

[8]    At the hearing, Respondents asserted that the coverage issues for business interruption losses are that BRE did not follow the policy's methodology and that BRE improperly included lost revenue from undamaged hotel rooms. Those arguments appear nowhere in their briefs, and Respondents do not cite any letter in which they previously advanced those arguments. The Court thus lacks sufficient details about these arguments—such as, for example, what the policy's purported methodology is—to conclude that a genuine coverage issue exists. And in any event, arguments first raised at a hearing may be deemed waived. *See Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016).

PageID.921—"involve exclusively scope and/or measurement issues."  ECF No. 1-8, at PageID.172.  Such issues are classic issues for appraisal.

BRE also asserts a claim for $4 million in furniture at the Turtle Bay Resort.  Respondents admit that, "to the extent a guestroom contains damaged furniture, BRE Hotels is entitled to a uniform 'set' of furniture" under the policy's consequential loss provision.  ECF No. 38-2, at PageID.759.  While Respondents allude to "a coverage issue . . . concerning the 'matching' of guestroom furniture," they do not identify a specific question about the policies' interpretation or application.  ECF No. 38, at PageID.731.  To the contrary, the parties appear to agree to the circumstances under which the policies cover matching furniture sets; the only outstanding questions are whether the furniture was in fact damaged and whether those specific damaged items could be individually replaced.  *See* ECF No. 38-2, at PageID.759.  These too are questions about the *fact* of the loss.  And such questions can be resolved by appraisal.

For these three categories of losses—the business interruption, certain property damage and ancillary costs, and the furniture—Respondents do not identify a genuine coverage issue that would preclude resolution in an appraisal process.

The final category, however, is the most contentious:  the tiles.  BRE claims that it is entitled to $7.1 million more to replace the tiles at the Grand Wailea

Resort, because large portions of the tile system were damaged by the storm.  ECF No. 1, at PageID.12.  Respondents believe that BRE is only entitled to replace fifty-seven specific tiles.  ECF No. 38-2, at PageID.756.  They say that the rest of BRE's tile-related claim is not covered by the policy for two reasons.  First, they contend that many of the Grand Wailea's tiles—and specifically, the tiles' underlying mortar bed and waterproofing membrane—suffered from preexisting defects and deterioration and were therefore not damaged by the storm.  *Id.* (reporting that their engineer "concluded that the storm caused no damage to either the underlying mortar bed or waterproofing membrane").  Second, while BRE sought to replace the entire waterproofing membrane, Respondents believe a partial replacement would suffice.  *Id.* at 758.  Finally, Respondents argue that the policies did not cover the replacement of non-matching, undamaged tiles "to maintain aesthetic uniformity."  *Id.* (quoting provision that "lacks any language requiring Insurers to cover the costs . . . to maintain aesthetic uniformity").

Set aside, for a moment, the aesthetic argument, and consider the dispute about the tile underlayment.  At base, it is a question of causation:  BRE says the "storm caused significant damage to the tile underlayment," ECF No. 44-2, at PageID.940; Respondents say "the storm caused no damage to either the underlying mortar bed or waterproofing membrane," as any damage to the tile underlayment was caused by original construction defects and subsequent

deterioration, ECF No. 38-2, at PageID.756.  The parties do not meaningfully

disagree—at least, not at this stage—that if the tile underlayment was damaged by

the storm, then it would be covered by the policy.

 Questions of causation, when they are fundamentally factual, are

appropriately considered during the appraisal process.  In *Amerex Group*, for

example, an insurer denied a claim for business interruption losses in part because

of the possible alternative explanations for the company's lost income, including

the terrorist attacks of September 11, an economic recession, and the bankruptcies

of major customers.  *Amerex Grp.*, 678 F.3d at 197.  The Second Circuit

recognized that "[a]pportioning damage causation from among the many factors

that influenced the state of [the insured]'s business . . . was a factually laborious

task that might have led to widely differing outcomes."  *Id.* at 206.  Despite the

complexity of the inquiry, the Second Circuit held that it was a factual issue

properly committed to the appraisal panel.  *See id.*; *see also Zarour v. Pac. Indem.

Co.*, 113 F. Supp. 3d 711, 716 (S.D.N.Y. 2015) (holding that, under New York

law, "the issue of damage causation is properly subject to appraisal"); Ashley

Smith, Comment, *Property Insurance Appraisal: Is Determining Causation

Essential to Evaluating the Amount of Loss?*, 2012 J. Disp. Resol. 591, 596-603

(recognizing the split authority on this point, but observing that the trend is to submit causation issues to the appraisal process).[9]

That reasoning applies just as strongly here. The question of whether the tile underlayment was damaged by the storm or had preexisting defects might prove to be a complicated one. But it is fundamentally a factual question about the

---

[9]   The parties cite no authority suggesting that Hawaiʻi state law differs from New York law in allowing factual causation issues to be submitted to appraisal. To be sure, Respondents cite *MMI Realty Services, Inc. v. Westchester Surplus Lines Insurance Co.,* Civil No. 07-00466, 2008 WL 11344896 (D. Haw. Jan. 2, 2008), for the proposition that appraisal is precluded if coverage issues exist. ECF No. 38, at PageID.739. There, in the course of denying a motion for reconsideration, Magistrate Judge Kevin Chang stated that causation issues should not be submitted to an appraisal panel. *MMI Realty Servs.,* 2008 WL 11344896, at *3. But Judge Chang did not cite Hawaiʻi state law to reach that conclusion. And as BRE points out, Judge Chang considered causation questions that unavoidably "implicated" coverage issues. *See* Order Granting in Part and Denying in Part Def.'s Mot. to Compel Arbitration, *MMI Realty Servs.,* Civil No. 07-00466 (D. Haw. Dec. 12, 2007), ECF No. 17, at PageID.244 ("[A] determination of causation *for the purpose of ascertaining the applicable policy limit* is, in effect, a determination of coverage and liability." (emphasis added)).

The Court has also considered *Mauna Kea Beach Hotel Corp. v. Affiliated FM Insurance Co.,* in which Judge David Ezra declined to submit causation issues to an appraisal panel. CV. No. 07-00605, 2008 WL 11345955, at *4-5 (D. Haw. Mar. 7, 2008). Respondents do not cite it, and with good reason, for it would not support their position. In that case, the party moving for appraisal had conceded that causation issues were generally not subject to appraisal; Judge Ezra therefore had no occasion to fully consider the question of whether and to what extent causation issues might be submitted to appraisal. *Id.* at *4 (focusing instead on the party's separate argument that specific policy language permitted the appraisal panel to consider causation questions). Moreover, Judge Ezra based his conclusions on New York law. *See id.* (citing *Duane Reade,* 411 F.3d at 389). And as noted above, New York law permits appraisal panels to consider causation questions that are factual in nature. *See, e.g., Amerex Grp.,* 678 F.3d 193.

rainstorm's damage and the associated amount of loss, not a legal question about the scope of the policies' coverage.  And an appraisal panel can undertake that factual inquiry, informed by the arguments and evidence presented by the parties.

Respondents also argue that effective waterproofing can be achieved by a narrower set of repairs than what BRE has requested.  *See* ECF No. 38-2, at PageID.757-58.  But Respondents do not claim—at least, again, not at this stage— that this is a dispute about coverage.  Instead, they contend that a broader set of repairs is "unnecessary."  *Id.* at PageID.758.  That is a factual question about the type of repairs needed to address the storm-related damage.  And as a factual question, it can be submitted to appraisal.

On the other hand, Respondents' other argument about the tiles—that the policies do not cover replacing tiles for aesthetic purposes—is a question of coverage.  BRE does not appear to dispute this.  Indeed, in at least one letter written by its representative, BRE explains why one of the policies' provisions should cover BRE's efforts to assure "visually cohesive, matching aesthetics" for its tiles.  ECF No. 44-2, at PageID.940.  As this presents a legal question about the best interpretation of the policies, it is one that must be reserved for a court.

It is conceivable that appraisal will not resolve all of the issues with BRE's claim.  After considering the parties' evidence, the appraisers might conclude, for example, that the tiles' waterproofing membrane was not damaged by the storm.

BRE could then make arguments that replacing all of the tiles nonetheless falls within the scope of the policy's coverage, perhaps by contending that the policy permits BRE to have matching, aesthetic tiles.  Such an argument would present interpretive issues best resolved in a court.  But for now, BRE's claim raises factual questions that may be resolved by the appraisal process.  The Court therefore GRANTS the petition to compel arbitration.

One final point bears mention.  At the hearing, BRE proposed the Court retain jurisdiction so that it could consider any coverage issues that arise during the appraisal process.  The Court agrees that retaining jurisdiction for that limited purpose might facilitate a prompt resolution of this dispute.  The Court will therefore administratively close the case and require the parties to provide periodic updates on the status of the appraisal process.  If a legal question about the scope of the policies' coverage arises during the appraisal process, the parties may notify the Court.  But if for any reason Respondents would prefer the Court not retain jurisdiction—for example, they suggested at the hearing that they are asking a New York state court to consider certain coverage issues—they should notify the Court no more than fourteen days after the date of this order.

//

//

//

26

## **CONCLUSION**

For the foregoing reasons, Respondents' Motion to Dismiss on *Forum Non Conveniens* Grounds is DENIED and BRE's Petition to Compel Arbitration is GRANTED.

Additionally, the Court DIRECTS the Clerk's Office to administratively close this case pending completion of the appraisal.  This administrative closure is solely an administrative matter.  It does not impact any party's rights or obligations, does not alter any previous rulings by the Court, and does not require a filing fee to reopen the case.  The Court retains jurisdiction over this case to allow the parties an opportunity to raise any disputes that arise about the scope of the appraisal process and/or subsequent coverage issues.  The parties are DIRECTED to file joint status reports beginning on October 1, 2024, and every three months thereafter, updating the Court on the status of the appraisal process.  Respondents may file a letter within fourteen days of this order requesting that the Court not retain jurisdiction.

IT IS SO ORDERED.

DATED:  September 11, 2024, at Honolulu, Hawaiʻi.

/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 24-00159 MWJS-KJM; *BRE Hotels & Resorts LLC,* et al. *v. Ace American Insurance Company*, et al.; ORDER DENYING RESPONDENTS' MOTION TO DISMISS AND GRANTING PETITIONERS' PETITION TO COMPEL ARBITRATION